**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

----------------------------------------------------------------X

KRISTEN PALTZ,                                   :

                               :    Civil Action No.

              Plaintiff,              :

                               :    **COMPLAINT**

      v.                                          :

                               :    **Jury Trial Demanded**

ALLIANCE HEALTHCARE SERVICES, INC.,      :
LISA CONSIGLIO and RICHARD DEVANEY, in   :
their individual and professional capacities,    :

                               :

              Defendant.            :

----------------------------------------------------------------X

Plaintiff Kristen Paltz, as and for her Complaint in this action against Defendant Alliance Healthcare Services, Inc. ("Alliance" or the "Company"), Lisa Consiglio ("Consiglio"), and Richard DeVaney ("DeVaney") (together, "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Alliance Healthcare Services, Inc. ("Alliance" or the "Company") touts its commitment to healthcare and aiding cancer patients, yet when one of the Company's employees, Kristen Paltz, who is a cancer patient, needed assistance, it instead discriminated and retaliated against her.

2.      Ms. Paltz worked at Alliance for 24 years, starting there in 1995. She had an excellent record at the Company. After she was diagnosed with breast cancer in 2011, she continued working full-time and maintained her high level of performance as an Account Executive. In 2017, at the recommendation of her doctor, Ms. Paltz requested and was permitted to work a four-day workweek due to the demands of her continuing cancer treatment.

3.      In the fall of 2018, Ms. Paltz began to raise regulatory and legal concerns to her new supervisor, Lisa Consiglio, about conflicts of interest that she believed violated federal law,

particularly the Stark Act or Stark Law.  Ms. Paltz's supervisor brushed her concerns aside and began retaliating against her because of her complaint, including by exhibiting increasing hostility towards Ms. Paltz over the next several months.

4.      Ms. Paltz tried to get assigned to a new supervisor, but Human Resources would not oblige, despite the fact that she let them know she feared she was being subjected to retaliation for making complaints regarding regulatory violations.

5.      In April and July 2019, Ms. Paltz raised concerns regarding equal pay with the Company's President, Richard Jones, but did not receive any substantive response.  Ms. Paltz's communications to Mr. Jones raised the fact that her pay had lagged during her long tenure and that the Company paid her significantly less than it paid many male colleagues in the same role who had far less tenure and experience.

6.      Ms. Paltz continued to raise concerns about being paid less than her male colleagues with her supervisors.  In December 2019, after months of inquiries that went unanswered, Ms. Paltz was informed that her pay would be increased (though still not to a level close to that of many similarly situated male coworkers) in March 2020.

7.      Vice President Richard Devaney, in the telephone conversation informing Ms. Paltz of the impending pay increase, berated Ms. Paltz for her repeated requests for equitable pay, and brusquely dismissed Ms. Paltz's schedule restrictions when she raised them as a potential barrier to her ability to meet her sales goals.  "**We have made too many accommodations for you,**" Devaney yelled at Ms. Paltz, expressing obvious animus against Ms. Paltz for her disability (breast cancer) and/or related accommodations.

8.    Management's animus against Ms. Paltz echoed discriminatory animus and actions perpetrated by the Company against other employees who also needed accommodations and/or who had disabilities.

9.    In January 2020, Ms. Paltz again raised concerns with her supervisor, Consiglio, regarding apparent legal violations concerning Company practices.  Once again, her manager dismissed her concerns and exhibited obvious frustration and resistance towards Ms. Paltz and the concerns she raised.

10.    Alliance's management made it clear that they viewed Ms. Paltz as a problem to be eliminated, and subjected her to an unlawful retaliatory termination shortly after she complained about the Company engaging in discriminatory pay practices and unlawful conduct that violated the False Claims Act and other laws.

11.    The Company and its officials, rather than taking steps to address her complaints further, instead tried to silence Ms. Paltz by terminating her under the pretext of including her in a reduction-in-force ("RIF") on April 1, 2020.  This termination followed her most recent complaints by mere months and was the culmination of more than a year of increasing retaliatory animus against Ms. Paltz.

12.    Companies and their management engage in this variety of "recessionary discrimination" when they use the cover of financially driven layoffs to target employees for termination for unlawful reasons, such as discrimination or retaliation.  Alliance did exactly that when it made Ms. Paltz part of a RIF that it initiated during the COVID-19 pandemic.

## NATURE OF ACTION

13.    The unlawful discrimination and retaliation described herein was committed in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"); the Family and Medical

Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); the Equal Pay Act of 1963, 29 U.S.C. §§ 206 *et seq.* ("EPA"); the Connecticut Equal Pay Act, Conn. Gen. Stat §31-75 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

## ADMINISTRATIVE PREREQUISITES

14.    Defendants' conduct also violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101 *et seq.* ("ADA"). In connection with these violations, Ms. Paltz will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the corporate and individual Defendants.

15.    This EEOC Charge will be dually filed with the Connecticut Commission on Human Rights and Opportunities (the "CHRO") alleging violations of the Connecticut Fair Employment Practices Act ("CFEPA") against all Defendants.

16.    When Plaintiff receives her Notice of Right to Sue from the EEOC and her Release of Jurisdiction from the CHRO, she will seek leave to amend this Complaint to assert claims under Title VII, the ADA, and the CFEPA because these additional claims arise from the common nucleus of operative facts alleged herein.

17.    Accordingly, any and all other prerequisites to the commencement of this action have, or will have, been met.

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of

Plaintiff's rights under federal law, namely the FCA, the FMLA, and the EPA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

19.     The Court has further jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is a diversity of citizenship among the parties and this action involves an amount in controversy in excess of $75,000, excluding interest and costs.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to this action, including unlawful employment practices alleged herein, occurred within this federal district.

## PARTIES

21.     Plaintiff Kristen Paltz is a resident of Westport, Connecticut and was a former Account Executive at Alliance.  At all relevant times, Ms. Paltz met the definition of an employee of Defendants under all applicable statutes.

22.     Defendant Alliance is a business corporation incorporated in Delaware with its headquarters located at 18201 Von Karman Avenue, Suite 600, Irvine, California, 92612.  At all relevant times, Alliance met the definition of an employer under all applicable statutes.

23.     Defendant Lisa Consgilio ("Consiglio") is a Regional Director of Physician Sales at Alliance.  Upon information and belief, Consiglio is a resident of the State of Pennsylvania. At all relevant times, Consiglio met the definition of an employer under all applicable statutes under which she is an individual Defendant.

24.     Defendant Richard Devaney ("Devaney") is the President of Physician Sales at Alliance.  Upon information and belief, Devaney is a resident of the State of Massachusetts.  At all relevant times, Devaney met the definition of an employer under all applicable statutes under which he is an individual Defendant.

## FACTUAL ALLEGATIONS

**I.**    **Background**

25.    Ms. Paltz joined Alliance more than 25 years ago, on October 16, 1995, as a District Field Marketing Representative, after she graduated with both a Bachelor of Arts in Human Development and Family Studies and a Master's in Healthcare Administration from Cornell University.

26.    Ms. Paltz worked hard as a full-time employee of Alliance, especially during the last nine years while she simultaneously battled breast cancer, which she was diagnosed with in 2011.

27.    In the years after her diagnosis, Ms. Paltz went through multiple surgeries, chemotherapy, radiation, and courses of various medications.  Ms. Paltz bravely worked over the years through her various cancer treatments, and she did so successfully.

28.    In 2017, Ms. Paltz's doctor recommended that she limit her workweek to four days because of the demands of her ongoing course of cancer treatment.

29.    Ms. Paltz was granted this reasonable accommodation and continued to work four days a week through the date of her termination on April 1, 2020.

30.    Until her ambush termination on April 1, 2020, Ms. Paltz developed an accomplished career at Alliance, where she gained valuable skills in the areas of sales, advocacy, healthcare systems, and radiologic technology.

31.    During this time, Ms. Paltz worked on-site at various hospitals and medical facilities in New York and Connecticut, spending more than half of her time in New York State and New York City.

32.     Ms. Paltz's 24-year tenure – which bridged numerous layoffs, reductions-in-force, reorganizations, and the like – speaks to the high quality of her work and her multi-faceted value to the Company.

33.     In over two decades at Alliance, Ms. Paltz advocated for cancer patients, promoted the Company, and successfully obtained countless sales leads, contracts, and account renewals for Alliance.

34.     Ms. Paltz's professional accomplishments at Alliance are too numerous to list here, but several recent examples are included below.

35.     On February 14, 2019, Ms. Paltz was awarded a "Valued Employee" certificate at the National Physician Sales meeting in Andover, Massachusetts.

36.     In January 2020, Ms. Paltz achieved 111.6% of her sales objectives, making her the number one performer in the country.

37.     Similarly, in February 2020, Ms. Paltz achieved 100.2% of her sales objectives. Such results immediately before her termination further demonstrates that her inclusion in a RIF was blatantly improper and done for illegal reasons.

38.     Finally, in July 2019, Ms. Paltz successfully garnered the important business of World Wrestling Entertainment ("WWE") by preparing to contract with WWE to have Alliance provide MRI services at all WWE events nationwide.  However, due to logistical reasons, Alliance was unable fulfill the client's needs.

## II.     Company Management Subjects Ms. Paltz to a Hostile Work Environment Because She Is Disabled and a Whistleblower

39.     Ms. Paltz began reporting to Lisa Consiglio, the Regional Director, Physician Sales, in November 2017.  From March through June 2018, Ms. Paltz had been assigned to do

marketing for both Northeast Radiology, P.C., in Brewster, New York, and Putnam Hospital Center in Carmel, New York, which were competing sites.

40.     Ms. Paltz was concerned about the appearance of a conflict of interest regarding marketing to two competing sites and brought this information and concern to Consiglio.  Ms. Paltz also pointed out that one of her coworkers, Hester Rock, Account Executive, had been kicked out of a hospital when it was discovered that she was simultaneously marketing for a competing site.

41.     In June 2018, Alliance hired an Account Executive, Stephanie Elliot, who began at Northeast Radiology alongside Margaret Albert, another Account Executive.  In the fall of 2018, Ms. Paltz spoke with Consiglio and told her that she had grave concerns that Ms. Elliot and Ms. Adler were going to Putnam Hospital (another site assigned to Ms. Paltz) while also marketing for Northeast Radiology.

42.     Ms. Paltz specifically mentioned that she believed this was a violation of the Stark Act.[1]

43.     Consiglio responded, "do not use those legal terms and do not waste the lawyers' time."  Ms. Paltz further told Consiglio that Miska Hadik, Physician Sales Manager, was also concerned about the legal repercussions, given the existing customer base, and would be reaching out to the legal team at Alliance.

44.     Ms. Paltz requested that a member of the Company's legal team be included on the conference call about this issue, but Consiglio once again refused.

---

[1]     See 42 U.S.C. § 1395nn.  The Physician Self-Referral Law, commonly referred to as the Stark Act, prohibits physicians from referring patients to receive "designated health services" payable by Medicare or Medicaid from entities with which the physician or an immediate family member has a financial relationship.

45.     Ms. Paltz also mentioned her concern that Putnam Hospital Center would be at a disadvantage if patients were sent to Northeast Radiology because it is an Independent Diagnostic Treatment Facility which could be far less expensive for the patient.  In response, Consiglio disagreed and said that patients who have PET scans have already met their deductible.  Ms. Paltz explained that this was not always true, especially when a patient had not met their deductible.

46.     Ms. Paltz then added that, being a cancer patient herself currently, she knew that Consiglio's contention was not true for every patient.  Ms. Consiglio brushed off Ms. Paltz's concern and did nothing to rectify the Company's practice.

47.     Shortly after Ms. Paltz complained, Consiglio began treating Ms. Paltz differently and in ways that demonstrated retaliation.  Some of Consiglio's retaliatory conduct included: a lack of acknowledgment of Ms. Paltz's 23-year work anniversary on a team call when Consiglio regularly recognized such achievements for other team members, ignoring complimentary remarks made about Ms. Paltz by clients, refusing to recognize Ms. Paltz's production of potential sales leads outside of her regular role, and a pointed directive by Consiglio that Ms. Paltz not contact senior leadership in the future.

48.     In November 2018, Ms. Paltz complained to Devaney, Vice President of Physician Sales, about Consiglio's retaliatory behavior and asked to be given a new manager.

49.     Devaney told Ms. Paltz that she needed to make a complaint to Human Resources ("HR").  Shortly thereafter, Ms. Paltz complained to HR regarding Consiglio's hostile and retaliatory conduct and the regulatory infractions Consiglio was condoning.

50.     As a result, on December 7, 2018, Ms. Paltz spoke to Mandi French, HR Business Partner.  When Ms. French was assigned to the matter, Ms. Paltz reached out to Christopher

Gruttadauria, Vice President of Human Resources, and asked for the matter to be reassigned to another HR Partner because Ms. French and Consiglio are close personal friends.  Mr. Gruttadauria refused.

51.     During multiple discussions with Ms. French, Ms. Paltz presented her with examples demonstrating that Consiglio was mistreating her to the point where Ms. Paltz felt the need to request a transfer to another manager.

52.     Ms. Paltz further explained to Ms. French that the added stress could further activate her cancer and the stress caused by Consiglio's actions was a danger to her health as a cancer patient.

53.     On December 21, 2018, Ms. French called Ms. Paltz and told her that she was not going to transfer her to a different manager.  As a result, Ms. Paltz called Mr. Gruttadauria and told him that working for Consiglio was causing her a great amount of stress, and that stress has the ability to exacerbate her cancer symptoms.

54.     Mr. Gruttadauria responded that he could assign a new HR Partner, and they could conduct a second investigation, "but you are going to have the same result."

55.     Soon, on January 4, 2019, Mr. Gruttadauria offered to facilitate a conversation between Ms. Paltz and Consiglio.  As Alliance had already made it clear that Ms. Paltz was going to have to continue working under Consiglio, about whom she had just complained to HR, Ms. Paltz decided not to engage in this conversation in the hopes of moving forward and not further antagonizing Consiglio.

56.     Understandably, Ms. Paltz did not want to make her work environment any worse than it already was.

57.     A few days later, on January 10, 2019, Ms. French stated that she could not substantiate Ms. Paltz's complaints and would be closing the investigation.

**III.    Ms. Paltz Complains About Pay Inequity and Again Is Targeted for Retaliation**

58.     Over the years, Ms. Paltz realized that she was being paid far less than newer Account Executives, especially in comparison to male Account Executives who were performing the same (or substantially similar) tasks and held an identical title to her own.

59.     On April 8, 2019, Ms. Paltz brought this gender-based pay disparity to the attention of Richard Jones, President, but she did not receive any substantive response.

60.     Subsequently, on July 25, 2019, Ms. Paltz wrote to Mr. Jones about the "inequitable" pay structure at Alliance.

61.     In September 2019, Ms. Paltz had a scheduled conference call with Consiglio and Devaney to further discuss this pay disparity.  Devaney told Ms. Paltz that they would "get back to [her]."

62.     On November 2, 2019, Ms. Paltz reached out to Devaney yet again, still having received no substantive response.

63.     On November 5, 2019, Devaney responded, "The 2020 Budget has not been approved as yet.  No decision on salary adjustments has been made."

64.     On December 9, 2019, still having received no substantive response to her concerns, Ms. Paltz reached out to Devaney again, knowing that the budget had been approved.

65.     Effective March 3, 2020, Ms. Paltz's salary would be increased by only approximately 7%, leaving her underpaid in comparison to her male colleagues by approximately 20%.  Ms. Paltz's numerous requests to make this pay increase retroactive were denied.

66.     On December 18, 2019, Ms. Paltz had a scheduled conversation with Devaney regarding her requested salary adjustment.  Devaney instantly became irate, stating in a resentful tone, "You got it -- you're getting your adjustment."  Devaney raised his voice and began screaming at Ms. Paltz that "an exception had to be made" because she had not met her plan goal for 2018 or 2019.  Ms. Paltz pointed out that she was currently at 99.7% of her plan goal for 2019 and she was at 104% for same-store growth.  Ms. Paltz also pointed out that she had been at the Company for 24 years.  Devaney continued to raise his voice, saying, "Lisa pushed hard for you to get this.  Did you hear me?  Lisa pushed hard for you!"

67.     Ms. Paltz responded to Devaney that she had a very difficult situation because she was budgeted for two days of service at Manchester Hospital per week but only had one day of service per week available.  Ms. Paltz pointed out that, though she had requested her numbers be adjusted to account for this fact, they had not been, which affected her ability to reach her plan goal.  Devaney continued on his tirade, stating: "I don't want to hear it Kristen -- I don't care about your budget or your downtime.  Everyone experiences that."  Ms. Paltz told Devaney that she had a higher budget than she had available patient spots to fill.  Mr. Devaney again tried to bulldoze Ms. Paltz, stating, "good Account Executives make their plan and find a way to meet their goal."  Incredibly, Devaney then stated that, "*We have made too many accommodations for you,*" clearly referring to the reasonable scheduling accommodation Alliance had made for Ms. Paltz's cancer treatment.

68.     When Ms. Paltz asked what the salary adjustment was that she would be receiving, Devaney continued to scream and said "I'm not telling you that!  Lisa [Consiglio] will contact you this week to discuss the adjustment."  Amid this one-way screaming tirade, Ms. Paltz calmly reminded Devaney that new Account Executives (without Ms. Paltz's 24 years of

experience) were making in excess of $75,000.  Devaney became even more angry and yelled, "I don't want to hear it Kristen.  Enough, you talk in circles and I don't want to hear any more about this from you!"

69.    Devaney added that he was angry because "Rich Jones has nothing to do with this and you copied him!  You took it upon yourself to write Rich Jones a letter!"  Devaney expressed hostility towards Ms. Paltz because she complained to Mr. Jones, the Company's President, regarding her concerns about unequal pay.

70.    It was clear from this statement that Devaney was infuriated by and did not want Ms. Paltz lodging complaints with senior leadership about unlawful conduct.  When Ms. Paltz tried to respond, Devaney interrupted her and said, "I don't care, and I don't want to hear it!"

IV.    **Alliance's History of Discrimination**

71.    The discrimination Ms. Paltz experienced and witnessed at Alliance was not limited to her alone.  Having worked at Alliance for more than 24 years, Ms. Paltz was privy to information about numerous former employees who had been discriminated or retaliated against, but ultimately decided not to pursue their legal claims.

72.    Alliance has engaged in systemic discrimination and retaliation against its employees and that management's conduct and practices show a pattern of unlawfulness.

73.    By way of example only, in 2016 a former Director of Account Management ("DAM") was suffering from Lymphoma.  As a result, this DAM took medical leave for a few months for treatment at Memorial Sloan Kettering.  Upon information and belief, the DAM made a complaint to HR about his supervisor.  While he was still employed by Alliance, the DAM told Ms. Paltz that he believed he was being pushed out and that his supervisor was creating a hostile work environment after his treatment.  Following his complaints to HR, the DAM left Alliance.

74.    In 2019, a male Account Executive ("AE"), took time off to care for his mother, who was battling cancer.  During his intermittent FMLA leaves, the AE indicated to Ms. Paltz that Consiglio was "making his life hell."  Ultimately, Consiglio put the AE on a performance improvement plan ("PIP") and would subject him to questioning every Friday.  Thereafter, the AE indicated that he felt like his every move was "under a microscope" and that he was being unduly scrutinized.  In spring 2019, Ms. Paltz received a notification that the AE was no longer with the Company.

75.    Also in 2019, a female AE went on short-term disability leave.  When she returned, Alliance gave her the territory of Long Island, which was far from her home in Connecticut and placed an undue hardship on her.  This female AE also indicated to Ms. Paltz that she felt like she was facing heightened scrutiny when she returned from leave.  Thereafter, the female AE resigned in February 2020.

## V.    Ms. Paltz Blows the Whistle on Illegal Activities at Alliance

76.    Since 2009 while at Alliance, Ms. Paltz was assigned to work with New York Presbyterian Hudson Valley Hospital in Cortlandt, New York ("Hudson Valley Hospital").

77.    Ms. Paltz's main contact at Hudson Valley Hospital was Manny Paris, Director of Radiology.

78.    In August/September 2017, Ms. Paltz attended a meeting in which Mr. Jones, the Company's President, offered a sum of $15,000,000 to two executives in order to purchase an ownership share in Northeast Radiology.

79.    On January 10, 2020, Mr. Paris wrote to Ms. Paltz, stating that Alliance was sending Ms. Albert, another Account Executive, to Hudson Valley Hospital and was directly marketing and soliciting referrals from physicians at the Hudson Valley Hospital Cancer Center

in order to redirect and steer those patients to Northeast Radiology, a competing site owned by Alliance. Both of these locations have contracts with Alliance and provide similar services.

80.    This activity immediately brought Ms. Paltz's previous concerns about Stark Act violations in 2018 back to the forefront. Because the rate at which Hudson Valley Hospital paid Alliance under the operative service agreement was dictated by whether or not Hudson Valley Hospital had met its quota requirement, Ms. Paltz believed that by steering these patients away from Hudson Valley and to Northeast Radiology, Alliance was directly interfering with Hudson Valley Hospital's ability to generate sufficient volume such that Alliance was able to increase the effective rates for its services to Hudson Valley Hospital.

81.    In addition, Ms. Paltz suspected that through this unlawful scheme, Alliance was able to effectively reduce the operating costs for its services to patients, thereby further increasing profits for itself and its subsidiaries.

82.    As a result, in mid-January 2020, Ms. Paltz spoke to Consiglio and made her aware of these regulatory and legal concerns. In these discussions, Ms. Paltz specifically told Consiglio that the Company's actions were in direct violation of the Stark Act and that she believed that Alliance's attorneys should become involved.

83.    Ms. Paltz followed up with multiple requests to be included on conference calls related to this violation because she was the Account Executive for Hudson Valley Hospital and the person who had brought this issue to the Company's attention. Consiglio refused Ms. Paltz's numerous requests.

84.    Mr. Paris was so shocked and upset that Consiglio had not included Ms. Paltz in the calls to discuss this clear violation of the Stark Act that he informed Ms. Paltz that Alliance

had steered a total of 111 patients (that he knew of) from the Hudson Valley Hospital Cancer Center to Northeast Radiology.

85.      Mr. Paris further informed Ms. Paltz that he had requested the names of the 111 patients that Alliance had rerouted from the Hudson Valley Hospital Cancer Center, but that Alliance had refused and stated that it had supposedly only steered 11 patients to Northeast Radiology, which Mr. Paris believed to be untrue.

86.      Then, on February 11, 2020, Gina Bonica, Deputy General Counsel and Chief Compliance Officer, and Consiglio pulled Ms. Paltz aside at the Company's national meeting and told her that Alliance does not own Northeast Radiology, and that physicians can send the patients wherever they want.[2]

87.      Both Consiglio and Bonica then began to pressure Ms. Paltz to divulge what Mr. Paris had said about the situation.

88.      Later that day, Consiglio cornered Ms. Paltz in the bathroom and said, "I am glad you had the opportunity to speak to [Ms. Bonica].  Now you can tell [Mr. Paris] that we do not own Northeast Radiology."

VI.      **Ms. Paltz Is Unlawfully Terminated**

89.      Ms. Paltz was unlawfully terminated by Defendants on April 1, 2020, under the guise and pretext of a pandemic-related RIF.

---

[2]      In fact, Alliance's website currently includes a timeline.  Listed under 2018, it states regarding the Company: "Acquired Northeast Radiology, a regional leader in multi-modality outpatient diagnostic imaging services located in New York and Connecticut." https://www.alliancehealthcareservices-us.com/about-us/history/ (last accessed January 6, 2021).

90.    Contrary to multiple false assertions made by Alliance, many members of Alliance's leadership were aware that Ms. Paltz had been diagnosed with breast cancer and was receiving ongoing treatment for this disease that rendered her partially disabled.

91.    Breast cancer is a chronic medical condition that constitutes a disability under all applicable laws because it impairs the major life activities of work, sleep, and normal cell development.

92.    At the time of her termination, Alliance was aware that Ms. Paltz was still receiving cancer treatment and was on intermittent protected medical leave through a temporarily reduced schedule.

93.    Among those who were aware of Ms. Paltz's ongoing cancer care were Consiglio, Devaney, Ms. French, and Mr. Jones.  Ms. Paltz considers her status as a cancer patient as a badge of honor, and often would tell anecdotes about her own experiences in order to advance the mission of Alliance to "improve the health and well-being of the people we serve by ensuring highly effective, community-based support and care."[3]

94.    As a result, nearly all of Ms. Paltz's colleagues were aware of her status as a cancer patient.  For example, on or around November 28, 2018, Consiglio stated to Ms. Paltz in an email: "I know that you are part time with medical issues."

95.    Ms. Paltz also had numerous conversations with Consiglio, Devaney, Ms. French, and Mr. Jones about her experience as a breast cancer patient.  Indeed, right up until her April 1, 2020 termination, Ms. Paltz was still working part-time due to her cancer treatment and had not given Consiglio any indication to the contrary.

---

[3]    See https://www.alliancehealthplan.org/about-alliance/vision-mission-and-values/#:~:text=Our%20mission%20is%20to%20improve,care%20in%20the%20public%20sector (last accessed on January 6, 2021).

96.     On or around July 25, 2019, Ms. Paltz wrote in an email to Mr. Jones, "Even when I'm at Memorial Sloan Kettering Cancer Center for my own cancer care, I continue to promote my own beliefs about the quality of our company and to the point where Memorial Sloan Kettering physicians have initiated and continue to send patients to our site locations."

97.     Moreover, in her 2011, 2012, 2013, 2015, 2016, 2017, and 2018 written reviews, Ms. Paltz specifically mentioned that she was a cancer patient.  Tina Reese, Regional Vice President of Operations, has called Ms. Paltz and asked her if she would be willing to allow Alliance to do an interview or an article documenting her experience undergoing breast cancer treatment, which would have been circulated throughout Alliance and beyond.  Ms. Paltz respectfully declined, and Ms. Reese ultimately did the interview herself following her own unfortunate bout with cancer.

98.     It is important that Ms. Paltz was **the only Account Executive selected for termination in her group of sixteen Account Executives in the Northeast region.**  The Company fired 38 employees in the RIF that Ms. Paltz was terminated in, out of the Company's entire workforce of 2,700 employees.

99.     The Company also chose not to include Ms. Paltz to be one of the 480 employees who were temporarily furloughed instead of being terminated outright.  **In short, every other Account Executive in the Northeast was either furloughed -- and later reinstated -- or suffered no adverse employment action at all.**

100.    The day after her April 1, 2020 termination, Ms. Paltz spoke to Richard Jones, the President of Alliance.  Ms. Paltz pleaded with Mr. Jones to place her on furlough status instead of terminating her so that she could maintain her health insurance and continue her cancer care.  Mr. Jones callously refused.

101.    On April 10, 2020,  Ms. Paltz received a text message from Mr. Rogers, former Alliance employee and current Regional Sales Manager at Shared Imaging, LLC, which stated, "Hey Kristen, I dialed your work number and a woman answered your phone stating you are no longer with the company and that your territory has been eliminated.  I told her I was very surprised since a number of your customers loved you!"

102.    Notably, Alliance recently posted a job listing for Ms. Paltz's former position on LinkedIn and Lensa, which has since been taken down.

### FIRST CAUSE OF ACTION
**(Retaliation in Violation of the FCA)**
*Against Alliance*

103.    Plaintiff repeats, reiterates, and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

104.     At all material times herein, Plaintiff was an employee of Defendants within the meaning of the FCA, and therefore she was covered by the whistleblower protections set forth in 31 U.S.C. § 3730(h).

105.    Plaintiff performed all the terms and conditions of her employment in a satisfactory or exemplary manner.

106.    Plaintiff had a reasonable suspicion in good faith that Defendants were engaged in unlawful activity that defrauded the federal government.  Specifically, Defendants were using their employees and agents to direct patients, some of whom were Medicare and Medicaid members, away from the Hudson Valley Hospital, from inside the Hudson Valley Hospital, so that the patients would be treated at Northeast Radiology, a facility that Defendant Alliance owned, in direct violation of the Stark Act.

107.    By the conduct of Defendants, respectively – and the actions or omissions of their agents, employees or officers, as described herein – Alliance wrongfully retaliated against Plaintiff for investigating and reporting the fraudulent practices that allowed Defendants to obtain government funds, including from the United States of America, contrary to the whistleblower protections of the FCA, 31 U.S.C. § 3730(h).

108.    Moreover, Defendants violated the FCA, 31 U.S.C. § 3730(h), when they threatened, harassed, discharged, and otherwise retaliated against Plaintiff regarding the terms, benefits, conditions, and privileges of her employment because she initiated, investigated, provided testimony for, or otherwise engaged in protected activity to stop Defendants' fraud against the federal government and Defendants' violation of the False Claims Act.

109.    Specifically, Defendants were using their employees and agents to direct patients, some of whom were Medicare and Medicaid members, away from the Hudson Valley Hospital, from inside the Hudson Valley Hospital, so that the patients would be treated at Northeast Radiology, a facility that Defendant Alliance owned in direct violation of the Stark Act.

110.    At all material times, Defendants were aware of Plaintiff's actions.

111.    As a direct and proximate result of Defendants' unlawful and wrongful actions or omissions against Plaintiff, as described in this complaint, Plaintiff has sustained injuries and damages, including, but not limited to, a loss of earnings, loss of career opportunities, mental and emotional distress and physical harm, loss of reputation and esteem in the community, and loss of ordinary pleasures of everyday life, including the opportunity to pursue the gainful occupation of her choice.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the FMLA)
*Against All Defendants*

112.    Plaintiff repeats, reiterates, and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

113.    At all times relevant herein, Defendant Alliance was a "covered employer" within the meaning of the FMLA.  Defendant Alliance employs 50 or more employees in at least 20 calendar weeks within a 75-mile radius of the primary Connecticut site of Ms. Paltz's employment.

114.    Upon information and belief, at all times relevant herein, Plaintiff was either actually or potentially eligible as a "covered employee" within the meaning of the FMLA because she worked full-time for more than 24 years at Alliance before she was unlawfully terminated by the Company.

115.    Defendants also violated the FMLA by interfering with Plaintiff's right to continue to take intermittent medical leave to obtain treatment for her disability because such leave would be covered under the FMLA.

116.    By the actions described above, among others, Defendants have retaliated against Ms. Paltz for informing Defendants that she intended to and did avail herself of the rights and benefits of the FMLA.

117.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

**THIRD CAUSE OF ACTION**
**(Unlawful Interference in Violation of the FMLA)**
*Against All Defendants*

118.    Plaintiff repeats, reiterates, and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

119.    By the actions described above, among others, Defendants have unlawfully interfered with Ms. Paltz's right to take FMLA leave and return to work from such leave by unlawfully terminating her employment.

120.    As a direct and proximate result of Defendants' unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses, and other relief.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the EPA)**
*Against Alliance*

121.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

122.    By the conduct described herein, Defendant required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including but not limited to her bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

123.    Defendant engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender, including by paying Plaintiff

a lesser rate of pay, including bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility and which were performed under the same working conditions and/or terms or at the same establishments.

124.    By the actions described above, among others, Defendant has violated the Equal Pay Act, 29 U.S.C. §§ 206 *et seq.*

125.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

126.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
***Against All Defendants***

127.    Plaintiff repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

128.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender and actual and/or perceived disability in violation of the NYSHRL by subjecting her to disparate treatment based upon disability, including, but not limited to, subjecting her to unequal standards and conditions of employment and terminating her employment.

129.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

130.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish, emotional distress and physical harm, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

131.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is further entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Discrimination in Violation of the NYSHRL)
### *Against Defendants Consiglio and Devaney*

132.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

133.    By the above-described conduct, Defendants Consiglio and Devaney knowingly or recklessly aided and abetted, and directly participated in, the unlawful discrimination to which Plaintiff was subjected in violation of the NYSHRL.

134.    As a direct and proximate result of Defendants Consiglio and Devaney's unlawful discriminatory conduct and harassment in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary, physical, and emotional harm for which she is entitled to an award of damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against All Defendants*

135.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

136.    Defendants have retaliated against Plaintiff on the basis of her protected activity in violation of the NYSHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, subjecting her to a hostile work environment and terminating her employment.

137.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

138.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish, physical illness, and emotional distress for which she is entitled to an award of monetary damages and other relief.

139.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
#### *Against All Defendants*

140.    Plaintiff repeats, reiterates, and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

141.    By the actions described above, among others, Defendants discriminated against

Plaintiff on the basis of her gender and actual and/or perceived disability in violation of the NYCHRL by subjecting her to disparate treatment based upon her disability and gender and terminating her employment.

142.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

143.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, injury, pain, ailments and conditions, as well as mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

144.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**NINTH CAUSE OF ACTION**
**(Aiding and Abetting Discrimination in Violation of the NYCHRL)**
*Against Defendants Consiglio and Devaney*

145.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

146.    By the actions described above, Defendants Consiglio and Devaney knowingly or recklessly aided and abetted, and directly participated in, the unlawful discrimination to which Plaintiff was subjected in violation of the NYCHRL.

147.    As a direct and proximate result of Defendants Consiglio and Devaney's unlawful discriminatory conduct and harassment in violation of the NYCHRL, Plaintiff has suffered, and

continues to suffer, monetary, physical, and emotional harm for which she is entitled to an award of damages.

148.     Defendants Consiglio and Devaney's unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against All Defendants***

149.     Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

150.     Defendants have retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, subjecting her to a hostile work environment and terminating her employment.

151.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

152.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish, physical illness, and emotional distress for which she is entitled to an award of monetary damages and other relief.

153.     Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Discrimination in Violation of the CEPA)
#### *Against Alliance*

154.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

155.    By the conduct described herein, Defendant required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort and responsibility, and which are performed under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including but not limited to her salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system which measures earnings by the quantity or quality of production, or a differential system based upon a bona fide factor other than sex.

156.    Defendant engaged in patterns, practices and/or policies of employment which willfully discriminated against Plaintiff on the basis of her gender, including by paying Plaintiff a lesser rate of pay, including bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility and which were performed under the same working conditions and/or terms or at the same establishments.

157.    By the actions described above, among others, Defendant has violated the Connecticut Equal Pay Act, Conn. Gen. Stat. § 31-75 *et seq.*

158.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, compensatory damages and other relief.

159.    Defendant's unlawful and discriminatory actions constitute intentional acts and/or acts committed with reckless indifference to Plaintiff's rights under the CEPA, for which Plaintiff is further entitled to an award of punitive damages.

**TWELFTH CAUSE OF ACTION**
**(Retaliation in Violation of the CEPA)**
***Against Alliance***

160.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

161.    Defendant Alliance has retaliated against Plaintiff on the basis of her protected activity in violation of the CEPA by subjecting Plaintiff to adverse actions because she engaged in protected activity by opposing discriminatory compensation practices, including, inter alia, subjecting her to a hostile work environment and terminating her employment.

162.    Defendant Alliance did discharge, expel and otherwise discriminate against Plaintiff because she opposed Defendant Alliance's discriminatory compensation practices.

163.    By the actions described above, among others, Defendant has violated the Connecticut Equal Pay Act, Conn. Gen. Stat. § 31-75 *et seq.*

164.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages, compensatory damages and other relief.

165.    Defendant's unlawful and discriminatory actions constitute intentional acts and/or acts committed with reckless indifference to Plaintiff's rights under the CEPA, for which Plaintiff is further entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of Connecticut;

B.    An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

C.    An award of compensatory damages for emotional distress and other physical and mental harm in an amount to be determined at trial;

D.    An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

E.    An award of liquidated damages under applicable statutes;

F.    An award of punitive damages in an amount to be determined at trial;

G.    An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

H.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 7, 2021
New York, New York

Respectfully submitted,

**MADSEN, PRESTLEY & PARENTEAU, LLC**

By:    */s/ William G. Madsen*
       William G. Madsen (CT 09853)

402 Asylum Street
Hartford, CT 06103
Telephone: (860) 246-2466
Fax: (860) 246-1794
wmadsen@mppjustice.com

**WIGDOR LLP**

Lawrence M. Pearson
(to be admitted *pro hac vice*)
Lindsay M. Goldbrum
(to be admitted *pro hac vice*)

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
lpearson@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Counsel for Plaintiff*